UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

ANN M. DESALVO,

                              Plaintiff,

         - v -                                    5:02-CV-1148
                                                  (NAM)(GJD)
SOCIAL SECURITY ADMINISTRATION;
JOANNE B. BARNHART, COMMISSIONER; EQUAL
OPPORTUNITY EMPLOYMENT COMMISSION;
CARLTON HADDEN, DIRECTOR; JOSEPH G.
MEDICIS; JOACHIM J. VOLHARD; CAROL KAISER;
KEVIN J. BERRY; DAVID NEUMANN; MARY JOAN
MELESKI; JILL SULLIVAN REED; ROXANA PONTIUS;
CAROLYN BURIAN,

                              Defendants.

─────────────────────────────────────────────

APPEARANCES:                                   OF COUNSEL:

ANN M. DESALVO
*Plaintiff Pro Se*

GLENN T. SUDDABY                               Paula Ryan Conan, Esq.
United States Attorney                         Assistant U. S. Attorney
Northern District of New York
100 South Clinton Street
Syracuse, New York 13261-7198
*Attorney for Defendants*

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        In a *pro se* amended complaint filed on October 9, 2002, plaintiff Ann M. DeSalvo alleged

that she suffered employment discrimination while working for the United States Social Security

Administration ("SSA") between September 1995 and May 1997.  Specifically, plaintiff alleges

that she was discriminated against on the basis of her age when the SSA's Office of Hearings and

Appeals ("OHA") hired her in a part-time capacity while offering full-time employment to two younger women.  As a further matter, plaintiff alleges that her age was a factor in OHA's decision to hire only lawyers for various "writer" positions which became available during her employment with SSA.  Plaintiff avers that she suffered "religious discrimination" as well by way of being forced to work in an area where a co-worker left a "vulgar postcard" in plaintiff's "line of vision."  Finally, plaintiff asserts that she was the victim of tort-like conduct by her superiors and co-workers such as harassment, interference with her work and abuse of power - all resulting in denial of justice and freedom to work without abuse.

After pursuing her administrative remedies with SSA which resulted in an agency investigation and evidentiary hearing before the Equal Employment Opportunity Commission ("EEOC") in November 2000, EEOC issued a determination that plaintiff had failed to meet her burden of proving age or religious discrimination.  Plaintiff appealed the ALJ's determination to EEOC which affirmed the decision in August 2002.  Plaintiff then commenced the present action in September 2002, suing SSA under 42 U.S.C. § 1983[1] along with various officials and employees of the SSA including two administrative law judges ("ALJ's").  Plaintiff also named EEOC as a defendant along with the ALJ who rendered the unfavorable determination concerning her claims of employment discrimination.  This Court previously granted the government's

---

[1]

Plaintiff did not assert New York State law as the basis for any of her claims nor did she actually state the statutory basis for federal court jurisdiction in the amended complaint. Rather, she presented her claims for filing on the *pro se* complaint form available through the Clerk's office.  This form is commonly used by inmate litigants who assert claims relating to conditions of confinement under 42 U.S.C. § 1983.  In its previous Memorandum-Decision and Order in this case, the Court presumed plaintiff intended to sue under the federal statutes which proscribe unlawful employment discrimination, e.g. Title VII codified at 42 U.S.C. § 2000e and the Age Discrimination in Employment Act ("ADEA") set forth in 29 U.S.C. § 621 *et seq.*, rather than 42 U.S.C. § 1983 since none of the named defendants were state actors.

2

motion to dismiss all defendants, save SSA, from the action.  Presently before the Court is a

motion by the sole remaining defendant SSA for summary judgment.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The Court has reviewed the entire administrative record which includes SSA's Report of

Investigation ("ROI") consisting of evidence gathered in the course of defendant's own

examination of plaintiff's claims.  The ROI includes sworn affidavits from plaintiff and various

witnesses.  The record also contains a transcript of the EEOC hearing concerning plaintiff's

complaints which occurred in November 2000.  This hearing transcript reflects the testimony of

the plaintiff and 14 additional witnesses.  Further, the Court has reviewed plaintiff's deposition

testimony from August 2005 and various affidavits and documents submitted by the parties.

Based upon review of the record, the following facts have emerged:

Plaintiff Ann DeSalvo was born on August 12, 1941.  From 1983 to 1995, plaintiff was

employed with by the United States Office of Personnel Management ("OPM") in Syracuse, New

York.  Plaintiff's final position with OPM was as a personnel staffing specialist at Grade GS-11,

Step 2.  In September 1995, the Syracuse OPM office was closed and its entire staff of over 40

people were subjected to a "reduction in force" ("RIF").

Having been advised of the planned RIF, plaintiff applied for a position with SSA's

Syracuse OHA.  Plaintiff was one of a number of RIF'd OPM employees interviewed for various

full-time and part-time positions by Carol Kaiser, the manager of the Syracuse OHA, and by the

Acting Hearing Office Chief, Administrative Law Judge Joachim J. Volhard.  During her

interview, Ms. Kaiser and ALJ Volhard informed plaintiff that the only  positions available in the

Syracuse OHA  were entry-level (GS-4) positions.  However, ALJ Volhard and Ms. Kaiser told

plaintiff that the possibility for future promotions existed, depending upon her performance at

OHA.

ALJ Volhard averred that he was reluctant to offer plaintiff an entry-level position at OHA because of her significantly higher grade level and work responsibilities at OPM.  Ms. Kaiser also averred that she was concerned about the prospect of spending six months training an employee with plaintiff's prior experience, only to have such an employee quit for lack of satisfaction with his or her grade-level.  In response to their expressed concerns about hiring her, plaintiff assured Ms. Kaiser and ALJ Volhard that her primary objective was to avoid a break in federal service, and that she understood that training would be required for her to learn her new agency's programs.  Thereafter, Ms. Kaiser offered plaintiff a position as a part-time GS-4 Office Automation Clerk.  Plaintiff began her employment with OHA effective September 17, 1995 .

Along with plaintiff, three other OPM employees who had been "RIF'd" obtained employment at the Syracuse OHA.  Two of these hires were hired for full-time positions at the GS-4 pay rate.  Plaintiff and the fourth new hire (Martha Glessing) were offered and accepted part-time employment with the Syracuse OHA which allowed them to work 32 hours per week. In addition, two other displaced OPM employees were offered full-time GS-4 positions with the Syracuse OHA, but declined the offers.

Prior to making these various offers of employment, Ms. Kaiser ranked the applicants based on information in their applications, prior work experience and their references.  Kaiser also asked the acting director of the Syracuse OPM for input on each  applicant.  Ms. Kaiser recalled that plaintiff's recommendation from her previous employer was "not bad, but simply not as good" as his comments about the other displaced OPM workers who were offered full-time OHA positions.  The other OPM employee who was offered a part-time position did not receive a strong reference from OPM, but the acting director asked Kaiser to hire Ms. Glessing since she

4

had only one year to work before obtaining her eligibility for a pension.

Plaintiff's position, Office Automation Clerk, required her to receive computer training on OHA's network and operating systems as well as the word processing and database entry programs used by the office.  Graduated positions within the office required more extensive computer training.  Dino Franceschi was the Regional Systems Administrator for the Syracuse OHA.  Franceschi testified that plaintiff was often absent from scheduled training sessions, she disrupted training, disagreed with established programs and procedures, had difficulty learning the most basic aspects of data entry, and sometimes cried while training was being conducted. Franceschi thought plaintiff believed that the computer training was beneath her given her prior elevated grade level.  Plaintiff, on the other hand, contends that Franceschi himself cancelled computer training sessions and often yelled at and humiliated her during training.

The administrative record also contains evidence that plaintiff was "resistant" to training or had difficulty in other aspects of her job.  For example, plaintiff was assigned to train with Jill Sullivan on how to prepare agency mailings.  During the administrative investigation of this matter, Ms. Sullivan averred that plaintiff was absent for scheduled training sessions, failed to follow up with on training and opted to ask fellow employees rather than Ms. Sullivan about procedures.  Ms. Sullivan also had the impression that plaintiff felt that her assigned duties were degrading.  Plaintiff once told Ms. Sullivan that in her "old job," she had a secretary who did such tasks.  For her part, plaintiff contends that Ms. Sullivan was sarcastic to her, harassed her in front of others, yelled, screamed and belittled her work.

For the first four months of her employment with OHA, plaintiff's workstation was a table against the wall outside Carol Kaiser's office.  Office personnel had used the table for file storage. When plaintiff cleared the files from the table, a postcard taped to the window just next to the

5

door to Carol Kaiser's office (to the left of plaintiff's line of sight) became visible.  The postcard depicted females on a beach in thong bikini bottoms bending over, making their partially exposed buttocks the focal point of the postcard.  As a devout Catholic, plaintiff was offended by the postcard which she perceived as  "vulgar" or "a form of pornography."  Plaintiff averred that she told Carol Kaiser that she was offended by the postcard and Ms. Kaiser stated that she was not going to take it down.

In December 1995, plaintiff's work location was changed to another floor in the office where she remained for about a year.  In late 1996 or early 1997, plaintiff was relocated back to the table in front of Carol Kaiser's office and she noticed that the post card was still there.  When plaintiff said "This post card is still here," to Carol Kaiser's secretary, Louise Galvin, she stated that Ms. Galvin removed the post card.  Ms. Kaiser did not recall plaintiff raising an objection to the post card until she to Ms. Galvin about it approximately one year after coming to work at OHA.  Ms. Kaiser testified that once plaintiff objected to the postcard, Ms. Galvin took it right down.

Plaintiff asserts that she was continually subjected to discrimination and harassment based on her religion.  During plaintiff's employment at OHA, fellow employees sometimes watched television programs in the office "break" room that plaintiff found offensive.  In plaintiff's presence, two of those employees, Jill Sullivan and Mary Jo Maleski, sometimes made remarks to the effect that they were aware that "some people" might not like the program choice; plaintiff felt those remarks were directed at her.  In December 1995, plaintiff started attending noon mass at a church within walking distance of the Syracuse OHA.  On "a few" occasions between December 1995 and Spring 1996, when plaintiff was traveling to or from church, she forgot to remove the black lace cap she wore to the services.  Plaintiff testified that Ms. Sullivan and Ms.

Maleski "laughed" or "giggled" when they saw her wearing the cap.  Plaintiff also testified that on a few occasions, Carol Kaiser referred to her as "Ms. Holy-holy"or "goody-two-shoes" or "goody-goody" while outside of the office but in the presence of other Syracuse OHA employees.  The record reveals that some OHA staff were "on their guard" in plaintiff 's presence because of her outwardly religious beliefs and were concerned that plaintiff might find certain comments offensive.

At the time of plaintiff's  interview for the Office Automation Clerk position, Judge Volhard and Carol Kaiser had discussed advancement opportunities that did not require additional outside education.   While Ms. Kaiser was responsible for posting the advertisements for graduated positions, the SSA Regional Personnel Office processed these applications.  When vacancies for various positions arose, announcements posted in the break room instructed employees on where to submit applications.  Hearing Office Clerk and Legal Assistant positions were open continuously throughout plaintiff's time at the Syracuse OHA.  Plaintiff did apply for a Hearing Office Clerk position on October 12, 1995, approximately one month after she began working at the Syracuse OHA, but she did not apply for any other promotions or advancements.  During the course of her OHA employment, plaintiff's name never appeared on any "well-qualified" list of applicants for any graduated position, but she assumed she would be promoted non-competitively based on her previous work experience with OPM and civil service promotion policies.  Plaintiff assumed that since she told Ms. Kaiser and Judge Volhard during her initial interview that she would like to work full-time and she told various people within the agency that she would like to work as a decision writer and thought she was qualified for this position, that she would be promoted.

The record reveals that OHA policy required decision writers to be either "attorney-

7

advisors" or "paralegal specialists." An "Attorney-Advisor" required the applicant be "a member of [a] Bar, in good standing."  And while a paralegal specialist  "decision writer" did not have to be an attorney, he or she was required to be an experienced agency employee who had extensive experience with and knowledge of SSA's programs.  Although plaintiff had not attended law school or even college, had not worked as a paralegal and had no experience drafting agency decisions, she believed she was qualified for a non-competitive promotion to a decision writer position.  During plaintiff's time employment with OHA, three "decision writer" positions were filled.  One of these positions was a "paralegal specialist " position, and the other two were "attorney-advisor" positions.

Linda Hendricks, who had previously been a legal assistant, was promoted to the paralegal decision writer position on or about plaintiff's first day of employment in September 1995.  Hendricks' prior position involved extensive preparation of files, reviewing evidence, and writing portions of decisions, as well as knowledge of SSA's disability programs, administrative hearings and exposure to Medicare cases.

On April 24, 1997, all Hearing Office Clerks, Legal Assistants, and Office Automation Clerks received a schedule prepared by Yvonne Kent for coverage of the office front desk phone duties for the month of May.  Plaintiff noted that her name appeared on the schedule five times for the month, whereas others on the list were on phone duty only two or three times.  Plaintiff believed that she had been assigned excessive phone duties in comparison to the rest of the employee pool.  Based thereupon, she resigned on April 29, 1997, by placing a handwritten note which said "I quit" in Kaiser's in-box while Kaiser was on the telephone.  After talking with ALJ Volhard, plaintiff later changed her mind about resigning, but she did not inform Ms. Kaiser of her change of heart.  Thus, on May 13, 1997, when Carol Kaiser arrived at the office for the first

time after plaintiff had returned to work, Kaiser was surprised to see plaintiff.  Indeed, after plaintiff resigned on April 29, Kaiser had hired a part-time receptionist.  When Kaiser met with plaintiff on May 13, 1997, plaintiff told her not only had she decided not to quit, but that she would like to change her day off from Thursdays, as has been scheduled prior to her "resignation," to Fridays.  However, since Kaiser had already told the new part-time receptionist that she could have Fridays off, Kaiser told plaintiff she would have to choose a day between Monday and Thursday as her day off.  During their meeting on  May 13, 1997, Ms. Kaiser also discussed with plaintiff what was expected of her in performing her job.  In response, plaintiff expressed her opinion that she was qualified for a "decision-writer" position in accordance with civil service promotion policies.  Ms. Kaiser disagreed with plaintiff, but told her to submit her application and see how the Regional Personnel Office would rank her qualifications.  Plaintiff again resigned from the Syracuse OHA on that same day.

Plaintiff complained to her union on May 30, 1997 about perceived mistreatment by OHA and contacted an EEO counselor to complain about employment discrimination on June 5, 1997. SSA investigated plaintiff's claims and issued a report of investigation in May 1998.  Plaintiff requested a hearing which was conducted by the EEOC on November 8, 2000.  EEOC issued a decision which found no basis for plaintiff's claims of religious or age discrimination on February 13, 2001.  There is no evidence in the record concerning any appeals filed by the parties to the EEOC determination.

### III.    DISCUSSION

A.    <u>Applicable Legal Standard</u>

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If a court, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in her favor, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See Celotex,* 477 U.S. at 323.

Courts have acknowledged the dangers of summary judgment in discrimination cases. "Because direct evidence of ... discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir. 1994)).  A plaintiff must, however, provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.  *Schwapp*, 118 F.3d at 110.

B.    Exhaustion of Administrative Remedies

The government contends that plaintiff failed to preserve most of her claims by failing to invoke the administrative process required of federal employees prior to suing for employment discrimination.  Plaintiff alleges that she complained to her union about the conduct referenced in the amended complaint on May 30, 1997 and first met with an EEO counselor on July 25, 1997.

An employee suing the federal government for employment discrimination must exhaust certain administrative remedies before initiating a lawsuit in federal court. *Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir. 2000).  The first step is to "initiate contact with a[n][EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1);

*see Boos*, 201 F.3d at 181.  According to defendant, invocation of the 45-day rule based even on the earlier of these two dates would preclude the bulk of plaintiff's claims which are based on events, instances and conduct which occurred in 1995 and 1996.

Previously, in opposition to defendant's motion to dismiss her complaint, plaintiff asserted vaguely the "continuing violation" theory which would toll the time period for complaining about the various acts of alleged discrimination perpetuated by defendant.  Given the assumptions afforded to litigants opposing a motion under Fed. R. Civ. P. 12(b)(6), together with plaintiff's *pro se* status and the absence of any discovery concerning this issue, the Court denied defendant's motion to dismiss plaintiff's discrimination on the ground of untimeliness.  In her present opposition papers, plaintiff seems to have abandoned her claim of a "continuing violation" on the part of defendant.  Moreover, she has not presented evidence of a "specific discriminatory" policy or mechanism by defendant which contributed to ongoing unlawful employment practices.  *See Lambert v. Genesee Hosp.,* 10 F. 3d 46, 53 (2d Cir. 1993).  In the absence of proof that defendant permitted "specific and related" incidents of discrimination to continue unremedied for so long as to amount to a discriminatory policy or practice, the continuing violation doctrine is not applicable in any event.  *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir. 1996); *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994).

Nevertheless, for reasons not cited by either party, defendant is not entitled to dismissal of plaintiff's claims - with one exception - on the ground of failure to exhaust timely her administrative remedies.  It is well-settled that the timeliness requirement at issue herein is not jurisdictional; the filing deadline is subject to waiver, estoppel, and equitable tolling.  *See Briones v. Runyon*, 101 F.3d 287, 290 (2d Cir. 1996) ; *Bruce v. U.S. Dep't of Justice*, 314 F.3d 71, 74 (2d Cir. 2002).  In *Bruce, supra*, the Second Circuit noted that an agency such as defendant waives a

11

timeliness objection by making an express finding that the complaint was timely or failing to appeal an EEOC determination of timeliness.  314 F.3d at 74 (citing *Rowe v. Sullivan*, 967 F.2d 186, 191 (5th Cir. 1992); *cf. Briones*, 101 F.3d at 291 (holding that "a governmental agency defendant may not have a 'second bite at the apple' by arguing lack of timely filing in federal court after failing to challenge an EEOC determination that the complaint was timely filed"). Further, in *Bruce*, the court cited with approval the Seventh Circuit's holding in *Ester v. Principi*, 250 F.3d 1068, 1071-72 (7th Cir. 2001), that an agency waived its timeliness defense where it had issued a final decision on the merits of a discrimination complaint and did not raise a timeliness defense until the complainant filed suit in federal court.  The Second Circuit deemed "good law" the Seventh Circuit's conclusion "that when an agency decides the merits of a complaint, without addressing the question of timeliness, it has waived a timeliness defense in a subsequent lawsuit." *Bruce*, 314 F.3d at 75 (quoting *Ester*, 250 F.3d at 1071-72).

In the present case, it is clear that the defendant agency fully investigated plaintiff's claims of employment discrimination, and thereafter participated in an evidentiary hearing conducted by EEOC.  EEOC then rendered a determination on the merits of said claims.  In the course of said administrative proceedings the only reference to the timeliness of plaintiff's claims appears in a footnote on the first page of EEOC's decision.  Specifically, the ALJ noted that plaintiff asserted she was discriminated against on the basis of her age when she was hired as a part-time employee by SSA in 1995, while younger applicants were offered full-time positions. The ALJ deemed this allegation "untimely since she did not contact an EEO Counselor within the required 45 day time period."  The Court presumes from the absence of evidence in the record that SSA made no additional arguments concerning timeliness of plaintiff's claims and/or that the ALJ considered the balance of claims raised in plaintiff's complaint timely.  In either event, there

is no indication that the issue of timeliness was raised in connection with any other aspect of plaintiff's claim or that either party appealed the determination of EEOC concerning the timeliness of the various instances of alleged unlawful discrimination at the heart of plaintiff's administrative complaint.  Thus, with the exception of plaintiff's claim that she suffered age discrimination at the hands of SSA in 1995 when she was initially hired and offered a part-time position, defendant has waived the defense of untimeliness in the present litigation.

In connection with plaintiff's age discrimination in hiring claim, the Court finds upon review of the entire record that EEOC's determination concerning the timeliness requirement was correct.  *See Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1017 (1st Cir. 1979) (EEOC's determination is a factor to be considered, but courts generally make an independent review of the timeliness of the agency filing).  Here, plaintiff does not argue that equitable tolling, waiver or estoppel should be applied to her claim of age discrimination upon being hired in 1995.  Moreover, there is no evidence in the record to suggest that any of these doctrines should be invoked to save plaintiff's 1995 claim of age discrimination in hiring.  Based thereupon, the Court finds that plaintiff did not satisfy the timeliness requirement and thus failed to exhaust required administrative remedies in connection with alleged age discrimination that occurred upon her hire in 1995.

C.    Age Discrimination in Denial of Promotion

Plaintiff alleges herein that during her employment with SSA younger employees in OHA were hired and/or promoted to legal assistant or decision writer positions while she was not despite being qualified for such a promotion.  To state a *prima facie* claim for age discrimination, a plaintiff must establish that: 1) she is a member of a protected class (over age 40); 2) she adequately performed the duties of her position; 3) she suffered an adverse employment action;

13

and 4) the action occurred under circumstances giving rise to an inference of age discrimination. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). In reviewing plaintiff's claim of discrimination under the ADEA, the Court must utilize the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The first step in the *McDonnell Douglas* formulation requires plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination or unlawful retaliation by the employer. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446-47 (2d Cir. 1999). There is no dispute that plaintiff was over the age of 40 while employed at OHA. Thus, plaintiff meets the criteria of being a member of a protected class.

There is intense factual dispute between the parties concerning whether plaintiff was satisfactorily performing her job duties. Viewing the evidence in the light most favorable to plaintiff, the Court will assume, without deciding, that plaintiff's job performance was adequate. Insofar as establishing adverse employment action, plaintiff asserts that she was denied a promotion to full-time work and was never considered for a "decision writer" position with OHA. Defendant has proffered various explanations for why plaintiff did not advance in hours or grade level, including the fact that with the exception of applying for a hearing office clerk position in October 1995, approximately one month after she began her employment with OHA, she never applied for a specific promotion. Instead, plaintiff states that "she told . . . [Carol Kaiser, ALJ Volhard and] anyone who would listen" at OHA that she wanted a full-time position with the agency "dozens of times" and assumed she would be considered for promotions based on her work performance and civil service promotion criteria. Since it is undisputed that plaintiff was not promoted during her tenure at OHA, the Court will assume she has established adverse employment action and that it occurred under circumstances giving rise to an inference of

14

discrimination since younger individuals were hired and/or promoted while plaintiff was employed by defendant.

In the second step of the *McDonnell Douglas* process, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Bickerstaff,* 196 F.3d at 446. Defendant has satisfied this element of the test by arguing evidence in the record which shows a number of things concerning plaintiff's lack of promotion. First, as referenced above, defendant contends that with the exception of applying for one full-time position about a month after beginning work at OHA, plaintiff did not apply for any vacancies in the agency which arose during the course of her employment. Rather, plaintiff admits that she assumed since she told her OHA supervisors and others both at the time of her interview and during the course of working at the agency that she wished to be considered for full-time employment, she would be promoted non-competitively based on her previous years of government employment with OPM. Specifically, plaintiff states that she could have been promoted non-competitively into a decision writer position based on her previous grade level and years of experience at OPM according to civil service requirements.

Defendant also asserts that plaintiff was not qualified for a decision writer position because she lacked both the educational background and/or experience for this job. To wit, defendant contends that OHA policies in effect at the time of plaintiff's employment required decision writers to be either attorneys or paralegal specialists with a working knowledge of disability matters and the ability to analyze, research and develop cases under the various federal disability law statutes. Insofar as plaintiff's application in October 1994 for a hearing office clerk position, defendant asserts that plaintiff did not complete the required computer training for this promotion.

15

The third part of the *McDonnell Douglas* process requires plaintiff to demonstrate that her age – and not the reason proffered by the defendant employer –  was the true reason for the adverse employment decision.  *Bickerstaff,* 196 F.3d at 446-47.  "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)."  *Id.*  Thus, plaintiff is required to come forward with some evidence that her age was a motivating factor in defendants' decision to terminate her employment.  As referenced above, plaintiff's claim that OHA offered younger employees full-time positions while relegating she and another older OPM employee to part-time positions at the time of her hire were correctly deemed time-barred by EEOC.  Regarding plaintiff's application for a full-time hearing office clerk position in October 1995, plaintiff has failed to show pretext in connection with defendant's explanation that she lacked the required computer training for this promotion.  Although plaintiff asserts that Dino Franceschi was impatient with her, screamed at her, and failed to follow through with scheduled computer training sessions, importantly, she does not allege that Franceschi's actions were in any way motivated by age discrimination.  Thus, there is no evidence in the record on which to base a conclusion that plaintiff was denied a promotion to a full-time hearing office clerk based on her age.

Insofar as plaintiff's claim that she was denied a promotion during her employment to a decision writer based on her age, the record likewise does not support this allegation.  OHA criteria required decision writers to be either attorneys or paralegal specialists.  During the time plaintiff was employed at OHA, two attorneys were hired as writers and only one employee, Linda Hendricks, was promoted to a paralegal specialist position.  Ms. Hendricks was promoted

on the first day of plaintiff's employment at OHA.  She had worked at OHA for several years, was a legal assistant prior to her promotion and had extensive experience in preparation of files, drafting of decisions and knowledge of federal disability programs.

Plaintiff has come forward with affidavits from two of her previous colleagues at OPM who opine that under **OPM** guidelines, OHA might have been authorized to promote her non-competitively to a decision writer position or other higher grade level work in accordance with civil service requirements.  In the first instance, the Court is not persuaded that affidavits concerning OPM guidelines and policies are even relevant to an inquiry regarding what a fellow agency, OHA did or did not do in the present case.  However, even assuming the relevance or applicability of plaintiff's submissions on this issue, it is simply of no moment that OHA **could have** promoted plaintiff but chose not to.

To prove age discrimination, plaintiff must show that: 1) the non-discriminatory reasons given by the employer are false; and 2) that the real reasons were discriminatory.  *Fisher v. Vassar College,* 114 F.3d 1332, 1335-1336 (2d Cir. 1995).  Even assuming the truth of plaintiff's assertion that OHA could have automatically promoted her non-competitively, there is simply no evidence in the record which suggests, much less proves, that OHA denied a promotion to plaintiff based on her age, particularly since plaintiff admits that she never even applied for such a position during her employment with OHA.  The law is well-settled that an employee alleging unlawful discrimination must show that an employer's proffered reasons for an adverse employment action are a pretext **for discrimination.**  *Fisher,* 114 F.3d at 1339.  "[A] reason cannot be proved to be a 'pretext **for discrimination**' unless it is shown **both** that the reason was false **and** that discrimination was the real reason." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).  The Court finds that no rational trier of fact could

17

look at the evidence in the case and conclude that age discrimination was the real reason or even a motivating factor in OHA's decision not to promote plaintiff spontaneously and non-competitively to a decision writer.

D.     Hostile Work Environment

A hostile work environment claim requires a showing that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered so as to create an abusive working environment.  *See Perry v. Ethan Allen, Inc*., 115 F.3d 143, 149 (2d Cir. 1997).  Whether a work environment is sufficiently abusive to be actionable under Title VII depends on all of the circumstances of a given situation, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys*., *Inc*., 510 U.S. 17, 23 (1993).  As a general rule, incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Perry*, 115 F.3d at 149 (citation and internal quotation marks omitted).  Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.  *See Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *Quinn v. Greentree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998).

Plaintiff asserts that she was harassed and abused by employees and her supervisors to the point that she became ill and developed shingles.  Even crediting her claim that it took Carol Kaiser a year or more to remove the "vulgar" postcard from her line of vision it is not possible for the Court to conclude that this action was evidence of defendant's hostility to plaintiff's religion. Plaintiff also states that she was assigned more telephone duties than other employees and was prohibited from changing her day off from Thursday to Friday.  It is unclear whether she cites

these as examples of the hostility of her work environment or as evidence of disparate treatment. In any event, the Court finds that the record does not support her claim that being assigned to extra phone duty or having to pick a day other than Friday as her day off was because of or related to her age or religion.  The Court notes that record does support plaintiff 's claim that her work environment was stressful and unpleasant.  However, even crediting plaintiff's allegations that fellow employees and supervisors were constantly "screaming" and "yelling" at her, there is no indication that this alleged abuse was based on plaintiff's age or religion.  As recently stated by a fellow district judge in a similar case "neither Title VII nor the ADEA prohibit employment decisions based on personal animosity or a poor working relationship. . . . Neither statute is "a civility code nor a statute making actionable the ordinary tribulations of the workplace.'" *Westerman v. General Nutrition Corp.*, 2007 WL 320796, *5 (W.D. Pa. January 30, 2007) (citing *Gharzouzi v. Northwestern Human Servs. of Pa.*, 225 F.Supp.2d 514, 534 (E.D. Pa . 2002) and *Davis v. City of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir.2001)).

Viewing the record in the light most favorable to plaintiff, the Court does not find that plaintiff's alleged harassment by fellow employees and/or supervisors meets the standard required for establishing age or religious discrimination under the ADEA or Title VII.  There is absolutely no evidence in the record which suggests any of the yelling, screaming, humiliation, joking or abuse allegedly heaped on plaintiff by employees at OHA had anything at all do with her age.  Furthermore, there is likewise no evidence which demonstrates that plaintiff was targeted for abuse based on her religion.  As noted by defendant, there were several other employees at OHA who were Roman Catholics and there is no indication that plaintiff or any other OHA employee was treated differently based on religion.  The record makes clear that some employees felt uncomfortable around plaintiff given the devout nature of her religious beliefs and may have

thought that her "prudish" ways were humorous or even silly.  And though sporadic jokes about plaintiff being "holy" or a "goody goody" might have been made in her presence, these incidents were not severe or pervasive enough to suggest hostility to plaintiff's **religion** - as opposed to her piety, hostility to which is not actionable.  Though plaintiff has succeeded in demonstrating that she felt unhappy, unappreciated and ostracized at work, she has not established that any of this alleged poor treatment of her was based on her age or religion.

E.      Constructive Discharge

A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.  *See Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983).  The working conditions must be so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.  *See id.*  Again, viewing the evidence in the light most favorable to plaintiff, the Court finds that no reasonable person would have felt compelled to resign based on the allegations of alleged hostility or discrimination claimed by plaintiff herein.  In any event, plaintiff has not adduced herein the type of evidence required to show a deliberate attempt on the part of defendant to "create intolerable workplace conditions" for plaintiff.  *See Whidbee v. Gazarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000).  Based thereupon, plaintiff's constructive discharge claim cannot stand.

**IV.     CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the motion by defendant for summary judgment is GRANTED; and it is further

ORDERED that plaintiff's amended complaint is hereby dismissed in its entirety.

IT IS SO ORDERED.

Dated: September 27, 2007
       Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge